UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RLED, LLC, a California
Limited Liability Company,

                                    NO. CIV. S-08-851 LKK/DAD

         Plaintiff,

    v.

                                         O R D E R

DAN GOOD DISTRIBUTING
COMPANY, INC., aka DAN
GOOD DISTRIBUTION COMPANY,
INC., a business entity
form unknown; CALIFORNIA
WINE COCKTAIL CO., INC.,
a California Corporation,
DENIS BONOFILIO, individually
aka DENIS BONFILIO,
individually,


         Defendants.
_____/

    Plaintiff RLED, LLC ("RLED"), the manufacturer of "Roaring

Lion" energy drink, has brought the present action against

defendants Dan Good Distributing Company, Inc., California Wine

Cocktail Co., Inc., and Denis Bonfilio alleging that they

distributed a counterfeit product under plaintiff's trademark.

Pending before the court are two motions.  First, defendants have

1

moved to dismiss on the grounds that plaintiff failed to comply with the written notification and arbitration provisions of the distribution agreement entered into by the parties.   Second, plaintiffs have filed a motion for a preliminary injunction.   The court resolves the matter upon the parties' papers and after oral argument.   For the reasons explained below, the court grants in part and denies in part the motion to dismiss, and grants the motion for preliminary injunction.[1]

## I. Background

Plaintiff RLED manufactures Roaring Lion energy drinks and owns the federally-registered "Roaring Lion" trademark.   Compl. ¶ 11.   In September 2002, plaintiff and defendants entered into a distribution agreement in which defendants were to serve as distributors of Roaring Lion.   Id. ¶ 4.   Among other obligations, defendants were prohibited from distributing any other energy drinks or taking any action that would "damage the reputation of RLED or the product."[2]   Distribution Agreement, Compl., Ex. C.   Defendants distributed plaintiff's three-gallon

---

[1] At oral argument, the court offered both parties an opportunity to put on evidence in support and opposition to the motion for preliminary injunction.  Both parties declined and thus the court proceeds on the written record.

[2] In May 2006, the parties also entered into an asset purchase agreement in which defendants purchased bar guns, pumps, lines, and other equipment from plaintiff.   Compl. ¶ 14; Asset Purchase Agreement, Compl., Ex. D.   Similar to the one-way exclusivity provision in the distribution agreement, the asset purchase agreement required that defendants "only dispense Roaring Lion energy drink through" the purchased property.   Asset Purchase Agreement at Article 2.

1  "bag in a box" product to various commercial establishments,

2  including, locally, the Virgin Sturgeon, Elk Grove Sports Bar,

3  and Little Prague.

4      In August 2007, plaintiff allegedly learned that defendants

5  were using the Roaring Lion name and trademark in connection

6  with a product that was not Roaring Lion.  Id. ¶ 16.  One of

7  plaintiff's sales representatives, Scott Macumber, was visiting

8  a customer account when he noticed a white box with a white

9  "Roaring Lion Energy drink" label on it.  Decl. Of Scott

10  Macumber ¶ 3.  Plaintiff normally used a white box with a blue

11  label on its products.  Upon closer examination, the sales

12  representative discovered that the packaging inside the box was

13  opaque mylar, rather than the clear plastic that RLED uses.

14  Id.; Decl. of Edward Hackney ¶ 4 (noting that plaintiff's

15  manufacturer used a clear plastic bladder).  Thereafter, he

16  visited several other restaurants and bars where defendant had

17  distributed in August 2007 and found similar occurrences.

18  Macumber Decl. ¶¶ 4-12 (attaching photographs of product

19  discovered).  In April and May 2008, Mr. Macumber again

20  discovered several instances of the allegedly counterfeit

21  product at customer sites and switched them out with authentic

22  Roaring Lion energy drink.  Id. ¶¶ 13-34.

23      Defendants maintain that the mislabeling was inadvertent.

24  In addition to distributing plaintiff's product, defendants also

25  manufactured another energy drink for distribution to "Jack's"

26  in San Diego between April 2007 and March 2008.  Decl. Of Denis

3

1    Bonfilio ¶ 5.  This energy drink was housed in opaque mylar

2    plastic and packaged in unlabeled white boxes.  Id. ¶ 6.

3    Defendants maintain that on numerous occasions, plaintiff's

4    product was damaged during transport and that defendants

5    therefore repackaged them in new boxes and affixed white labels

6    identifying them as Roaring Lion.  Id. ¶¶ 7-8.  Mr. Macumber,

7    plaintiff's sales representative, allegedly knew about this

8    practice and in fact made deliveries of plaintiff's product in

9    this repackaged form.  Id. ¶ 10.

10        Defendants concede, however, that "[e]vidently, a finite

11   amount of energy drink manufactured by Dan Good for distribution

12   to San Diego, was inadvertently mislabeled as Plaintiff's

13   Product."  Id. ¶ 11.  Defendants maintain that drivers pulling

14   deliveries for Roaring Lion unintentionally applied the white

15   Roaring Lion label to the "Jack's" energy drink.  Id. ¶ 12.

16   According to defendants' calculation, a maximum of 317 boxes of

17   energy drink was inadvertently labeled as Roaring Lion between

18   April 2007 and March 2008.[3]  Id. ¶ 13.  Because each box

19   contained a three gallon bag, plaintiff argues that the

20   mislabeled product could have reached over 87,000 customers.[4]

21        The distribution agreement between the parties contains a

22

23       [3] There were 758 boxes of energy drink available to "Jack's"
     in San Diego.  Bonfilio Decl. ¶ 13.  Of these 758 boxes, 441 were
24   sold to Jack's.  Id.  Accordingly, defendants reason that at most
     317 (758 minus 441) boxes of energy drink were inadvertently
25   labeled as plaintiff's product.

26       [4] Assuming a serving size of 250 ML, 317 three-gallon bags
     would produce 87,492 servings.  Hackney Decl. ¶ 15.

                                    4

notice-and-cure provision that states that with regard to "breaches of agreement under this contract . . . the breaching party shall have thirty days, following written notification, in which to cure any breach."  Distribution Agreement ¶ 7. Although the provision does not state the effect of noncompliance (e.g., whether it precludes the nonbreaching party's ability to terminate the agreement, or precludes the assertion of a breach of contract claim), there is no dispute between the parties that defendants did not receive written notification of any alleged breach.

The agreement also provides that "in the event of any actual or threatened breach of this agreement which could cause irreparable harm to either party, that party shall be entitled to seek equitable relief, including . . . injunctive relief." Id. ¶ 12(E).  Aside from equitable relief, however, the agreement mandates that "any dispute under or relating to the terms of this Agreement or breach thereof . . .  shall be submitted to arbitration. . . . The parties agree to arbitration only after first attempting to resolve the dispute by mediation."  Id. ¶ 12(F).  In short, non-equitable relief is subject to mediation and arbitration, whereas equitable relief is not.  The parties have not entered into either mediation or arbitration.

On April 22, 2008, plaintiff filed the present action against defendants alleging violations of the Lanham Act, 15 U.S.C. §§ 1114 et seq., violations of the California Unfair

1  Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq., common

2  law injury to business reputation, and breach of contract

3  relating to both the distribution agreement and asset purchase

4  agreement.  After defendants filed their motion to dismiss

5  (arguing, inter alia, that the majority of plaintiff's claims

6  constituted alleged violations of the distribution agreement and

7  that plaintiff had failed to satisfy the conditions precedent to

8  bringing suit under the agreement), plaintiff voluntarily

9  dismissed its breach of contract claim relating to the

10 distribution agreement.

11      Plaintiff has also filed a motion for a preliminary

12 injunction.  The requested injunction would enjoin defendants

13 from: (1) using the Roaring Lion trademark for any purpose other

14 than selling product that has been manufactured and purchased

15 from plaintiff; (2) using any mark that imitates or is similar

16 to the Roaring Lion trademark, (3) using plaintiff's name except

17 as provided for in the distribution agreement, and (4) passing

18 off any counterfeit products.

19                          **II. Standards**

20 **A. Motion to Dismiss for Failure to State a Claim**

21      On a motion to dismiss, the allegations of the complaint

22 must be accepted as true.  See Cruz v. Beto, 405 U.S. 319, 322

23 (1972).  The court is bound to give the plaintiff the benefit of

24 every reasonable inference to be drawn from the "well-pleaded"

25 allegations of the complaint.  See Retail Clerks Intern. Ass'n,

26 Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n.6

1   (1963).  Thus, the plaintiff need not necessarily plead a

2   particular fact if that fact is a reasonable inference from

3   facts properly alleged. See id.; see also Wheeldin v. Wheeler,

4   373 U.S. 647, 648 (1963) (inferring fact from allegations of

5   complaint).

6       In general, the complaint is construed favorably to the

7   pleader.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The

8   court may not dismiss the complaint if there is a reasonably

9   founded hope that the plaintiff may show a set of facts

10  consistent with the allegations.  Bell Atlantic Corp. v.

11  Twombly, 127 U.S. 1955, 1967-69 (2007).  In spite of the

12  deference the court is bound to pay to the plaintiff's

13  allegations, however, it is not proper for the court to assume

14  that "the [plaintiff] can prove facts which [he or she] has not

15  alleged, or that the defendants have violated the . . . laws in

16  ways that have not been alleged." Associated General

17  Contractors of California, Inc. v. California State Council of

18  Carpenters, 459 U.S. 519, 526 (1983).

19  **B. Preliminary Injunctive Relief**

20      The Ninth Circuit has established two sets of criteria for

21  preliminary injunctive relief, both of which balance the

22  plaintiff's likelihood of success against the relative hardships

23  of the parties.  See Save Our Sonoran, Inc. v. Flowers, 408 F.3d

24  1113, 1120 (9th Cir. 2005).  "Under the 'traditional' criteria,

25  a plaintiff must show '(1) a strong likelihood of success on the

26  merits, (2) the possibility of irreparable injury to plaintiff

1   if preliminary relief is not granted, (3) a balance of hardships
2   favoring the plaintiff, and (4) advancement of the public
3   interest (in certain cases).'" Id. (quoting <u>Johnson v. Cal. Bd.</u>
4   <u>Of Accountancy</u>, 72 F.3d 1427, 1430 (9th Cir. 1995)).

5       Alternatively, a court may grant the injunction if the
6   plaintiff "demonstrates *either* a combination of probable success
7   on the merits and the possibility of irreparable injury *or* that
8   serious questions are raised and the balance of hardships tips
9   sharply in his favor." <u>Id.</u> (emphasis in original).  Both
10  formulations "represent two points on a sliding scale in which
11  the required degree of irreparable harm increases as the
12  probability of success decreases.  They are not separate tests
13  but rather outer reaches of a single continuum." <u>Baby Tam & Co.</u>
14  <u>v. City of Las Vegas</u>, 154 F.3d 1097, 1100 (9th Cir. 1998).

15                          **III. Analysis**
16  **A. Notice-and-Cure Provision**

17      First, defendants argue that plaintiff has failed to comply
18  with the notice-and-cure provision of the distribution
19  agreement, which provides that "with regard to breaches of
20  agreement under this contract . . . the breaching party shall
21  have thirty days, following written notification, in which to
22  cure the breach."  Distribution Agreement ¶ 7.  In defendants'
23  view, plaintiff's failure to provide such written notification
24  (which is undisputed) acts as a bar to all of plaintiff's
25  claims, not only the now-dismissed breach of contract claim
26  pertaining to the distribution agreement.

                                8

1  The problem with defendant's view is that the distribution

2  agreement does not state that in order to commence litigation,

3  plaintiff must provide written notification.  Indeed, it is

4  silent on the effect of failure to comply with the notice-and-

5  cure provision.  Typically, however, the purpose of a notice-

6  and-cure provision is to provide the breaching party the

7  opportunity to cure the breach before the non-breaching party

8  has the right to *terminate* the contract.  See, e.g.,, Civic Ctr.

9  Apartments, Ltd. Partnership v. Sw. Bell Video Servs., 295 F.

10 Supp. 2d 1091, 1096 ("If a Party defaults on its obligations

11 under this Agreement and fails to cure the default within

12 fifteen (15) days after receiving written notice . . . the

13 non-defaulting party may terminate the contract."); Sinclair v.

14 Servicemaster, No. CIV. 07-611 FCD/KJM, 2007 WL 3407138, at *1

15 (E.D. Cal. Nov. 14, 2007) ("[defendant] is required to provide

16 plaintiff with 10 days written notice and an opportunity to cure

17 any willful and material breach of the Employment Agreement

18 before termination.").  Alternately, a party is not deemed to be

19 in "breach" of the contract (i.e., for purposes of a breach of

20 contract claim) until the notice-and-cure provision has been

21 satisfied.  See, e.g.,, 24/7 Records, Inc. v. Sony Music

22 Entertainment, Inc., -- F. Supp. 2d --, No. 03 Civ. 3204(MGC),

23 2008 WL 2791522, at *3 ("Neither party to this Agreement shall

24 be deemed to be in breach . . . until the other party [gives]

25 written notice of such default and the alleged breaching party

26 shall have failed to cure such default within thirty (30)

9

1   days"); <u>California ex rel. Lockyer v. Vons Companies, Inc.</u>, NO.

2   05CV08972 DSF, 2006 WL 1806368, at *17 (C.D. Cal. Jan. 3, 2006).

3       The case relied upon by defendants, <u>Gerber v. First Horizon</u>

4   <u>Home Loans Corp.</u>, No. C05-1554P, 2006 WL 581082 (W.D. Wash. Mar.

5   8, 2006), is notable more for its differences than its

6   similarities with this case.  There, the contract stated:

7   "Neither [party] may commence, join, or be joined to any

8   judicial action . . . until such [party] has notified the other

9   party . . . and afforded the other party hereto a reasonable

10  period after the giving of such notice to take corrective

11  action."  <u>Id.</u> at *1.  Given that clear language, the court

12  dismissed the action because the plaintiff had failed to give

13  such notice.  <u>Id.</u> at *3.  Here, however, the distribution

14  agreement is silent on the precise effect of noncompliance with

15  the notice-and-cure provision.

16      The court finds that the notice-and-cure provision does not

17  operate as a bar to plaintiff's claims.  First, where the

18  distribution agreement intended to erect a barrier to suit, it

19  was clear in doing so.  In a separate contract provision, for

20  example, the distribution agreement provided that claims for

21  non-equitable relief had to be submitted to arbitration.

22  Distribution Agreement ¶ 12(F) (claims for non-equitable relief

23  "shall be submitted to arbitration").  The notice-and-cure

24  provision, by contrast, and in contrast the provision at issue

25  in <u>Gerber</u>, did not contain similar language.  In short, had the

26  parties intended for the notice-and-cure provision to stand as a

1  condition precedent to suit, they should have said so.

2       Second, even if the notice-and-cure provision were read as

3  a condition precedent to suit, it would only apply to the claim

4  for breach of contract (which plaintiff has voluntarily

5  dismissed), rather than plaintiffs' statutory and common law

6  claims.  Unlike the arbitration provision, which is written

7  broadly to include "any dispute under or relating to the terms

8  of the Agreement" (and which, as detailed below, must be

9  liberally construed in favor of arbitration pursuant to either

10 the Federal or California Arbitration Act), the notice-and-cure

11 provision is narrow: it applies only to "breaches of agreement

12 under this contract."  In order to give every word meaning, the

13 court must presume that these distinctions are purposeful.  See

14 Chiron Corp. V. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1131

15 (9th Cir. 2000) (finding that the "arising out of or relating

16 to" language is "broad and far reaching").  In addition,

17 although the court ultimately concludes that plaintiffs' claims

18 for non-equitable relief are subject to mediation and

19 arbitration, it would make little sense for defendants to "cure

20 a breach" for statutory damages.  Accordingly, the court finds

21 that the notice-and-cure provision does not act as a bar to the

22 claims at issue.

23 **B. Arbitration and Mediation Provision**

24      Defendants also argue that to the extent plaintiff's claims

25 seek non-equitable relief, they are barred by the arbitration

26 and mediation provision.  As noted above, the distribution

1   agreement provides that "except in the event equitable relief is

2   sought . . . if any dispute under or relating to the terms of

3   this Agreement or breach thereof should arise, it is agreed that

4   the same shall be submitted to arbitration."  Distribution

5   Agreement ¶ 12(F).  Indeed, arbitration is not even available

6   until the parties first attempt to resolve the dispute by

7   mediation.  Id.

8       Plaintiff responds that they have dismissed their breach of

9   contract claim relating to the distribution agreement and

10  therefore should be free to seek any relief -- equitable and

11  non-equitable -- for their remaining claims.  The problem is

12  that much of the underlying conduct that gave rise to the breach

13  of contract claim is the same conduct that gives rise to the

14  remaining claims.  For instance, the distribution agreement

15  clearly states that defendants "shall take no action to damage

16  the reputation of RLED or the Product."  Distribution Agreement

17  ¶ 3(H).  Plaintiff's claims for common law injury to business

18  reputation, and false designation of origin under the Lanham Act

19  (alleging that defendants' "counterfeit product is different and

20  inferior in quality," Compl. ¶ 62), rely on the same factual

21  predicates cast in a different legal light.  Similarly, the

22  distribution agreement forbids the defendants from

23  "distribut[ing] another energy drink," Distribution Agreement ¶

24  1, yet that factual allegation is part and parcel of plaintiff's

25  Lanham Act claims.

26      Accordingly, the question before the court is whether the

12

1 arbitration provision encompasses only breaches of contract *qua*

2 breaches of contract, or encompasses conduct that, while perhaps

3 constituting breach of contract, also violates statutory and

4 common law protections.

5     The contract at issue is governed by either the Federal

6 Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16, or the California

7 Arbitration Act ("CAA"), Cal. Code Civ. Proc. §§ 1280 et seq.[5]

8 The FAA represents the "liberal federal policy favoring

9 arbitration agreements" and "any doubts concerning the scope of

10 arbitrable issues should be resolved in favor of arbitration."

11 Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., ("Moses") 460

12 U.S. 1, 24-25 (1983).  A party cannot avoid arbitration by

13 merely asserting violation of federal law, unless Congress has

14 evinced an intention to preclude arbitration for the statutory

15 rights at issue.  Gilmer v. Interstate/Johnson Lane Corp., 500

16 U.S. 20, 26 (1991).  Similarly, under the CAA, courts will

17 "indulge every intendment to give effect to [arbitration]

18 proceedings."  Adajar v. RWR Homes, Inc., 160 Cal. App. 4th 563,

19 568 (2008) (internal quotation marks omitted).  For purposes

20 here, the distinction between the FAA and the CAA is immaterial.

21     In Filimex, LLC v. Novoa Investments, LLC, No. CV

22 05-3792-PHX-SMM, 2006 WL 2091661 (D. Ariz. Jul. 17, 2006), the

23 court confronted facts similar to the ones present here.  There,

24 the parties entered into a trademark licensing agreement, which

25 _____

26     [5] The FAA would apply if the distribution agreement evidences
a transaction involving interstate commerce.  9 U.S.C. § 2.

1  required arbitration for "any dispute between Licensor and

2  Licensee arising under or pursuant to the terms of this

3  Agreement."  Id. at *1.  The defendant continued to use the

4  trademark even after the licensing agreement had been

5  terminated.  Plaintiff conceded that its breach of contract

6  claim was subject to arbitration but argued that its trademark

7  infringement and related statutory/common law claims were not.

8  The court rejected this argument, finding that the arbitration

9  agreement was susceptible to an interpretation that would

10 encompass such claims.  The court noted that under Ninth Circuit

11 law interpreting the FAA, the "factual allegations need only

12 'touch matters' covered by the [agreement]."  Id. at *5 (quoting

13 Simula v. Autolive, Inc., 175 F.3d 716, 718 (9th Cir. 1999)).

14 Here, the arbitration is at least as broad (if not broader,

15 given its "relating to" language) than that at issue in Filimex.

16     Similarly, in Gidatex, S.R.L. v. Campaniello Imports, Ltd.,

17 13 F. Supp. 2d 420 (S.D.N.Y. 1998), the court found that claims

18 for trademark misappropriation, unfair competition, and unjust

19 enrichment were subject to arbitration, even though the contract

20 between the parties pertained only to distribution and

21 licensing.  Id. at 426 (finding sufficiently close nexus between

22 contractual relationship and claims at issue).

23     Because the arbitration and mediation provision of the

24 distribution agreement is written broadly to include "any

25 dispute under or relating to the terms of this Agreement or

26 breach thereof," the court finds that to the extent any claims

                                14

1  seek non-equitable relief, they are subject to mediation and

2  arbitration.  See Moses, 460 U.S. at 24-25; Filimex, 2006 WL

3  2091661, at *5; Gidatex, 13 F. Supp. 2d at 420.

4      The fact that the contract requires mediation as a

5  condition precedent to arbitration does not change this

6  conclusion.  In Ponce Roofing, Inc. v. Roumel Corp., 190 F.

7  Supp. 2d 264, 267 (D.P.R. 2002), the contract at issue provided

8  that "[a]ny claims arising out of or related to this Subcontract

9  . . . shall be subject to mediation as a condition precedent to

10  arbitration or the institution of legal or equitable proceedings

11  by either party."  Because the parties failed to mediate, "the

12  [c]ourt conclude[d] that the parties should proceed to

13  mediation, and, if necessary, arbitration, as they agreed to do

14  when they signed the contract."  Id. at 267 (granting motion to

15  dismiss).

16      Similarly, in Mortimer v. First Mount Vernon Indus. Loan

17  Ass'n, No. Civ. AMD 03-1051, 2003 WL 23305155, at *1 (D. Md. May

18  19, 2003), the contract at issue stated that "any dispute or

19  claim arising out of or from this Contract . . . shall be

20  mediated. . . . Neither party shall initiate or commence any

21  action in any court . . . without first submitting the dispute

22  or claim to mediation."  While the court found that it could not

23  order the parties to mediate, it dismissed the claims without

24  prejudice.  Id. at *3.  See also DeGroff v. MascoTech Forming

25  Technologies Fort Wayne, Inc., 179 F. Supp. 2d 896, 912-13 (N.D.

26  Ind. 2001) (granting motion to dismiss where parties' had not

1  entered into mediation as a condition precedent to arbitration);

2  SEMCO, LLC v. Ellicott Mach. Corp. Int'l, No. Civ.A. 99-1928,

3  1999 WL 493278 (E.D.La. Jul. 9, 1999) (enforcing contract

4  compelling mediation as a prerequisite to arbitration).[6]

5  Accordingly, the court finds that to the extent plaintiff's

6  claims seek non-equitable relief, they must be dismissed.

7  Finally, plaintiff argues that the defendants should not be

8  permitted to invoke the terms of distribution agreement,

9  including the arbitration and mediation provision, where they

10  have willfully violated it.  Plaintiff also contends that when

11  the parties entered into the agreement, "[i]t was never

12  contemplated that Defendants would steal the RLED name and

13  trademark."  Pl.'s Opp'n at 8.

14  Assuming, for purposes here, that defendants have in fact

15  willfully violated the agreement, there is no exception made in

16  the contract for bad faith conduct.  As noted above, the

17  mediation and arbitration provision is clear, and it is broad.

18  It applies to "any dispute under or relating to the terms of

19  this Agreement or breach thereof," without regard to whether the

20  conduct giving rise to the dispute was in good faith or bad

21

22  [6] The rationale for the result apparently uniformly reached
by courts of this circuit is less than obvious.  The ordinary rule
23  is that the breach of the contract by one party releases the other
of the obligation to perform.  Thus, one would assume that the
24  agreement to mediate is rendered ineffective upon breach.  This is
not like an agreement to arbitrate, whose enforcement is mandated
25  by statute.  Arguably, the agreement to mediate is enforceable
because the parties agreed that a breach would not render the
26  mediation provision unenforceable.

1   faith.   Indeed, the Ninth Circuit has held that even a claim for

2   breach of the implied covenant of good faith and fair dealing

3   (i.e., where the breaching party has willfully violated the

4   contract) is nevertheless subject to arbitration.  <u>See</u> <u>Building</u>

5   <u>Materials Constr. Teamsters Local No. 216 v. Granite Rock Co.</u>,

6   851 F.2d 1190, 1194 (9th Cir. 1988).  Accordingly, the court

7   finds that the claims for non-equitable relief fall within the

8   scope of the mediation and arbitration provision and therefore

9   must be dismissed.

10   **C. Preliminary Injunction**

11       Because the arbitration provision only applies to non-

12   equitable relief, plaintiffs may still pursue their request for

13   a preliminary injunction.  As noted above, under the traditional

14   criteria for preliminary injunctive relief, plaintiff must show

15   a likelihood of success on the merits, the possibility of

16   irreparable injury, a balance of hardships favoring the

17   plaintiff, and advancement of public interest.  <u>Save Our</u>

18   <u>Sonoran</u>, 408 F.3d at 1120.  Alternately, plaintiff may show

19   either a combination of probable success on the merits and the

20   possibility of irreparable injury or that serious questions are

21   raised and the balance of hardships tip strongly in its favor.

22   <u>Id.</u>

23       As an initial matter, defendants argue that plaintiff has

24   unreasonably delayed in seeking a preliminary injunction.  <u>See</u>

25   <u>Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.</u>, 745 F.2d

26   1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary

injunction is a factor to be considered in weighing the

propriety of relief."). Here, plaintiff allegedly learned in

August 2007 that defendants had been distributing an energy

drink other than Roaring Lion. Compl. ¶ 15. The present action

was filed in April 2008 and plaintiff filed the instant motion

for injunctive relief in June 2008.

Plaintiff responds that at the time plaintiff initially

discovered the trademark infringement, plaintiff was already

engaged in litigation and could not afford to engage in another

lawsuit at that time. Decl. of Edward Hackney ¶¶ 17, 18 (noting

that "[i]n August, 2007 RLED was a defendant in a lawsuit

brought by Red Bull GmbH that threatened to bankrupt RLED and

put it out of business"). Furthermore, plaintiff argues that a

portion of the delay was consumed by pre-litigation

investigation and that the parties were also engaged in

settlement discussions in late April 2008 and early May 2008.

Under these circumstances, the court finds that the delay should

not bar plaintiff's request for injunctive relief, but should

nevertheless weigh as a factor in the court's analysis.

### 1. Likelihood of Success on Merits

Plaintiff's claims under the Lanham Act, 15 U.S.C. §§ 1114

& 1125, and the California Unfair Competition Law, Cal. Bus. &

Prof. Code § 17200, both require the same analysis. See Ford

Motor Co. v. Ultra Coachbuilders Inc., NO. EDCV 00-00243-VA,

2000 WL 33256536, at *2 (C.D. Cal. Jul. 11, 2000) (noting that

claims for trademark infringement, false designation of origin,

1   and unfair competition all require the same analysis).

2       "To show a likelihood of success on the merits, plaintiff

3   must establish that a likelihood of confusion exists." <u>Sardi's</u>

4   <u>Restaurant Corp. v. Sardie</u>, 755 F.2d 719, 723 (9th Cir. 1985).

5   The Ninth Circuit has developed eight factors (also referred to

6   as the <u>Sleekcraft</u> factors) to guide this determination.  They

7   include "(1) the similarity of the marks; (2) the relatedness of

8   the two companies' services; (3) the marketing channel used; (4)

9   the strength of [plaintiff's] mark; (5) [defendant]'s intent in

10  selecting its mark;[7] (6) evidence of actual confusion; (7) the

11  likelihood of expansion into other markets; and (8) the degree

12  of care likely to be exercised by purchasers." <u>GoTo.com, Inc.</u>

13  <u>v. Walt Disney Co.</u>, 202 F.3d 1199, 1205 (9th Cir. 2000).

14      Here, there is a strong likelihood for confusion.  The two

15  marks at issue are identical: labels that were meant to

16  designate Roaring Lion energy drinks were applied instead to the

17  energy drinks manufactured by defendants.  The two products

18  obviously vie for an identical consumer base.  Indeed, according

19  to plaintiff's evidence, defendants' product was discovered at

20  several locations where plaintiff was distributing its product.

21  Although the energy drinks manufactured by defendants came in

22

23      [7] Intent to confuse customers is *not* required for a finding
    of trademark infringement.  <u>Brookfield Commc'n, Inc. v. W. Coast</u>
24  <u>Entm't Corp.</u>, 174 F.3d 1036, 1045 (9th Cir. 1999).  Instead, intent
    is relevant as a factor simply because, "[w]hen the alleged
25  infringer knowingly adopts a mark similar to another's, reviewing
    courts can presume that the defendant can accomplish his purpose:
26  that is, that the public will be deceived." <u>AMF Inc. v. Sleekcraft</u>
    <u>Boats</u>, 599 F.2d 341, 354 (9th Cir. 1979).  Stated differently,

1  mylar rather than clear plastic bladders, and with white labels

2  rather than blue labels, there is no evidence to suggest that

3  the customers (e.g., restaurants and bars) paid attention to

4  this difference or would have any reason to suspect that the

5  product labeled as Roaring Lion was anything other than Roaring

6  Lion.

7      Furthermore, there is evidence to suggest that customers in

8  fact believed that the mislabeled products in fact came from

9  Roaring Lion.  Mr. Macumber, plaintiff's sales representative,

10 spoke to the bar manager of Zinfandel on April 28, 2008, who

11 said that they had not re-ordered Roaring Lion energy drink

12 because the taste was inconsistent.[8]  Macumber Decl. ¶ 29.  In

13 light of the factors noted above, it is likely that the

14 recipients of the mislabeled goods simply believed that they

15 were receiving Roaring Lion energy drink.

16     **2. Possibility of Irreparable Injury**

17     Ordinarily, "[i]n a trademark infringement claim,

18 irreparable injury may be presumed from a showing of likelihood

19 of success on the merits." GoTo.com, 202 F.3d at 1205 n.4

20 ("This presumption effectively conflates the dual inquiries of

21 this prong into the single question of whether the plaintiff has

22 shown a likelihood of success on the merits."); see also

23

_____

24     [8] Although this evidence is hearsay, "it [is] within the
   discretion of the district court to accept [] hearsay for purposes
25 of deciding whether to issue the preliminary injunction." Republic
   of the Philippines v. Marcos, 862 F.2d 1355 (9th Cir. 1988); Flynt
26 Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984).

1   Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832,

2   841 (9th Cir. 2001) ("Evidence of threatened loss of prospective

3   customers or goodwill certainly supports a finding of the

4   possibility of irreparable harm.").  Here, however, defendants

5   argue that they have taken corrective action.  Even though

6   plaintiff's have shown a likelihood of success on the merits

7   with respect to defendants' prior conduct, an injunction would

8   do nothing to redress confusion already caused by that conduct.

9   Accordingly, in order to show the possibility of irreparable

10  injury, plaintiff must demonstrate the possibility that

11  defendant will infringe upon their rights in the future.

12      Defendants represent that they have now ceased the

13  manufacture, purchase, sale, and distribution of all energy

14  drinks; returned any existing stock of plaintiff's product to

15  plaintiff; and destroyed all labels, stickers, and signs

16  concerns plaintiff (and its mark) in its possession.[9]

17  Defendants also represent that they have "changed from white

18  boxes to brown boxes."  Defs.' Opp'n at 11.

19      It is well-settled "'that an action for an injunction does

20  not become moot merely because the conduct complained of was

21  terminated, if there is a possibility of recurrence, since

22  otherwise the defendant's would be free to return to [their] old

23

_____

24          [9] With regard to the last action, plaintiff argues that
    defendant has engaged in spoliation of evidence.  If plaintiff
25  seeks discovery sanctions, it must file a separate motion fully
    briefing the issue.  Likewise, plaintiff's argument that defendants
26  have failed to comply with their Rule 26 mandatory initial
    disclosures should be the subject of a separate motion to compel.

1  ways.'"  <u>FTC v. Affordable Media</u>, 179 F.3d 1228, 1237 (9th Cir.

2  1999) (quoting <u>FTC v. Am. Standard Credit Sys., Inc.</u>, 874 F.

3  Supp. 1080, 1087 (C.D. Cal. 1994)).

4      Here, the possibility of irreparable injury hinges on

5  defendants' representation that the mislabeling was accidental,

6  rather than intentional.  Although the absence of "intent" is

7  not a defense to infringement, <u>Brookfield</u>, 174 F.3d at 1045, if

8  the mislabeling was in fact accidental, it would be unlikely to

9  reoccur because defendants possess no other RLED product.  Even

10  if defendants decided to resume manufacturing and distribution

11  of their own energy drink product,[10] the only scenario in which

12  that product would be labeled as Roaring Lion is if the

13  defendants willfully infringed upon plaintiff's trademark.

14      Under the circumstances, the court finds that there is at

15  least a possibility that defendants will resume their past

16  unlawful conduct.  The infringement that took place was not an

17  isolated incident: it occurred over a period of several months

18  and affected hundreds of boxes (and thousands of servings) of

19  energy drink.  Furthermore, although plaintiff has voluntarily

20  dismissed its breach of contract claim relating to the

21  distribution agreement, it appears that defendants' conduct in

22  manufacturing their own energy drink was in clear violation of

23  _____

24      [10]  Indeed, it seems quite likely that defendants wish to
   resume the manufacture and distribution of their own energy drink.
25  For example, they switched from using white boxes (used by
   plaintiff) to brown boxes -- which would only be relevant as a
26  precautionary measure for future sales.

1   the distribution agreement.  The court is unpersuaded that the

2   mislabeling of these products was accidental.

3       As noted earlier, the court notes that there was a modest

4   delay before plaintiff sought an injunction.  Nevertheless,

5   given that plaintiff has shown a strong likelihood of success on

6   the merits, and at least a possibility of irreparable injury,

7   the court finds a preliminary injunction is appropriate.  The

8   court therefore enjoins defendants from: (1) using the Roaring

9   Lion trademark for any purpose other than selling product that

10  has been manufactured and purchased from plaintiff; (2) using

11  any mark that imitates or is similar to the Roaring Lion

12  trademark, (3) using plaintiff's name except as provided for in

13  the distribution agreement, and (4) passing off any counterfeit

14  products.

**IV. Conclusion**

16      For the reasons explained above, defendants' motion to

17  dismiss is GRANTED IN PART without prejudice and DENIED IN PART

18  and plaintiff's motion for preliminary injunction is GRANTED.

19  Plaintiff shall post a $100 bond.

20      IT IS SO ORDERED.

21      DATED:  August 28, 2008.

23  _____
    LAWRENCE K. KARLTON
24  SENIOR JUDGE
    UNITED STATES DISTRICT COURT